UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BOARD OF TRUSTEES OF THE LOCAL 810 AFFILIATED PENSION FUND and BOARD OF TRUSTEES OF THE UNITED WIRE, METAL AND MACHINE HEALTH & WELFARE FUND, | : : : | **COMPLAINT** |
| Plaintiffs, | : | 21 CV 6079 |
| | : | **ECF CASE** |
| v. | : | |
| MAJESTIC RUG CLEANING COMPANY, INC. | : | |
| Defendants. | | |

Plaintiffs, Board of Trustees of the Local 810 Affiliated Pension Fund and Board of Trustees of the United Wire, Metal and Machine Health & Welfare Fund, by and through their attorney, Mark A. Torres, states by way of complaint against Defendant Majestic Rug Cleaning Company, Inc. as follows:

1.      This is an action seeking payment of the Defendant's withdrawal liability to the Fund pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, including, without limitation, Sections 4201 through 4301, 29 U.S.C. §§ 1381 through 1451.

2.      This is also an action is based on the provisions of Section 301 of the Labor Management Relations Act of 1947 (hereinafter referred to as the "Taft-Hartley Act") 29 U.S.C. Section 185, and on Section 502(a)(3) and Section 515 of the Employee Retirement Income Security Act, as

amended (hereinafter referred to as "ERISA") (29 U.S.C. Section 1132(a)(3) and 29 U.S.C.

1145) for the collection of delinquent contributions.

## THE PARTIES

3.     The Trustees are the named fiduciary of the Local 810 Affiliated Pension Fund

(hereinafter referred to as the "Pension Fund"). The Pension Fund is a jointly administered,

multiemployer, labor-management trust fund established and maintained pursuant to collective

bargaining agreements in accordance with Section 302(c)(5) of the Taft-Hartley Act, 29 U.S.C. §

186(c)(5). In addition, the Pension Fund is an employee pension benefit plan, within the meaning

of ERISA §§ 3(2), (3) and 502(d)(1), 29 U.S.C. §§ 1002(2), (3), and 1132(d)(1), and a

multiemployer plan within the meaning of ERISA §§ 3(37) and 515, 29 U.S.C. §§ 1002(37) and

1145. The Fund maintains offices at 24-09 38th Avenue, Long Island City, New York 11101.

4.     The Trustees are the named fiduciary of the United Wire, Metal and Machine Health &

Welfare Fund (hereinafter referred to as the "Welfare Fund"). The Welfare Fund is a jointly

administered, multiemployer, labor-management trust fund established and maintained pursuant

to collective bargaining agreements in accordance with Section 302(c)(5) of the Taft-Hartley

Act, 29 U.S.C. § 186(c)(5). In addition, the Welfare Fund is an employee pension benefit plan,

within the meaning of ERISA §§ 3(2), (3) and 502(d)(1), 29 U.S.C. §§ 1002(2), (3), and

1132(d)(1), and a multiemployer plan within the meaning of ERISA §§ 3(37) and 515, 29 U.S.C.

§§ 1002(37) and 1145. The Welfare Fund maintains offices at 24-09 38th Avenue, Long Island

City, New York 11101.

5.     Upon information and belief, the Defendant was at all relevant times an "employer"

within the meaning of Sections 3(5) and 515 of ERISA (29 U.S.C. Sections 1002 (5) and 1145)

and was an employer in an industry affecting commerce within the meaning of Section 301 of the Taft-Hartley Act (29 U.S.C. Section 185).

6.      Upon information and belief, the Defendant was a for profit domestic corporation duly organized and existing pursuant to the laws of the State of New York with a principal place of business at 644 Whittier Street, Bronx, New York 10474.

## JURISDICTION & VENUE

7.      This Court has jurisdiction to hear this action pursuant to ERISA § 4301(c), 29 U.S.C. § 1451(c), because the district courts of the United States have jurisdiction over actions brought by a plan fiduciary to collect withdrawal liability and delinquent benefit fund contributions under ERISA.

8.      Venue is proper in this district pursuant to ERISA § 4301(d), 29 U.S.C. § 1451(d), because the Defendant conducted business within the Eastern District of New York.

## FACTUAL ALLEGATIONS

9.      Pursuant to a collective bargaining agreement (the "CBA") between the Defendant and the International Brotherhood of Teamsters Local 810 (the "Union"), the labor organization that for collective bargaining purposes represented the employees of the Defendant, the Defendant had a duty to contribute to the Pension and Welfare Fund in accordance with the terms of the CBA and the Agreement and Declaration of Trust Establishing the Funds. A true copy of the relevant portions of the CBA and Trust Indentures are hereby attached as Exhibit "A".

10.     Defendant made contributions to the Pension Fund until on or about December 31, 2020, at which time it completely withdrew from the Pension Fund.

11.     The Defendant's withdrawal from the Pension Fund triggered the imposition of withdrawal liability pursuant to ERISA § 4202, 29 U.S.C. § 1382.

12.     By letter dated January 7, 2021 (the "Demand Letter"), the Pension Fund notified the Defendant that it had effected a complete withdrawal from the Pension Fund and therefore was subject to the payment of withdrawal liability pursuant to ERISA § 4203(a), 29 U.S.C. 1383(a), and the terms of the Trust Agreement. As explained in the Demand Letter, the Defendant's payment schedule provided for a single payment of $1,139,409.00, or 80 quarterly payments of $4,196.00. In accordance with ERISA § 4219(c)(2), 29 U.S.C. § 1399(c)(2), the payments were to commence no later than 60 days after the date of the Demand Letter.  A true copy of the Demand Letter is hereby attached as Exhibit "B".

13.     By letter dated March 2, 2021 (the "Default Letter"), the Pension Fund notified the Defendant that, *inter alia*, the Pension Fund had not received payment as described in the Demand Letter. As explained in the Default Letter, if the Defendant's failure to pay was not cured, it would be deemed to be in default of the withdrawal liability pursuant to ERISA § 4219(c)(5), 29 U.S.C. § 1399(c)(5). Once in default, the Pension Fund would be entitled to require immediate payment of the outstanding amount of the Defendant's withdrawal liability, plus accrued interest. A true copy of the Default Letter is hereby attached as Exhibit "C".

14.     The Defendant is in default as a result of not having paid its withdrawal liability pursuant to the terms of the Default Letter. Pursuant to ERISA § 4219(c)(5), 29 U.S.C. § 1399(c)(5), the Defendant is required to immediately pay the total outstanding amount of its withdrawal liability, plus accrued interest on the total outstanding liability from December 31, 2020, the due date of the first payment that was not timely made.

15.     To date, the Defendant has not made any payment towards satisfying the withdrawal liability. As a result, the Pension Fund has been damaged and has been deprived of money due and owing to the Pension Fund in the amount of $1,139,409.00.

## AS AND FOR A FIRST CLAIM OF RELIEF
### (PLAINTIFF'S CLAIM FOR WITHDRAWAL LIABILITY UNDER ERISA)

16.     Plaintiff's repeat, reiterate and re-allege each and every allegation contained in

paragraphs 1 through 15 of this Complaint, as if fully set forth herein.

17.     Pursuant to a collective bargaining agreement (the "CBA") between the Defendant and

the Union, the labor organization that for collective bargaining purposes represented the

employees of the Defendant, the Defendant had a duty to contribute to the Pension Fund in

accordance with the terms of the CBA and the Agreement and Declaration of Trust Establishing

the Local 810 Affiliated Pension Trust Fund.

18.     Defendant made contributions to the Pension Fund until on or about December 31, 2020,

at which time it completely withdrew from the Fund as of December 31, 2020.

19.     The Defendant's withdrawal from the Pension Fund triggered the imposition of

withdrawal liability pursuant to ERISA § 4202, 29 U.S.C. § 1382.

20.     By letter dated January 7, 2021 (the "Demand Letter"), the Pension Fund notified the

Defendant that it had effected a complete withdrawal from the Pension Fund and therefore was

subject to the payment of withdrawal liability pursuant to ERISA § 4203(a), 29 U.S.C. 1383(a),

and the terms of the Trust Agreement. As explained in the Demand Letter, the Defendant's

payment schedule provided for a single payment of $1,139,409.00, or 80 quarterly payments of

$4,196.00.  In accordance with ERISA § 4219(c)(2), 29 U.S.C. § 1399(c)(2), the payments were

to commence no later than 60 days after the date of the Demand Letter.

21.     By letter dated March 2, 2021 (the "Default Letter"), the Pension Fund notified the

Defendant that, *inter alia*, the Pension Fund had not received payment as described in the

Demand Letter. As explained in the Default Letter, if the Defendant's failure to pay was not

cured, it would be deemed to be in default of the withdrawal liability pursuant to ERISA

§ 4219(c)(5), 29 U.S.C. § 1399(c)(5). Once in default, the Pension Fund would be entitled to require immediate payment of the outstanding amount of the Defendant's withdrawal liability, plus accrued interest. A true copy of the Default Letter is hereby attached as Exhibit "C".

22.     The Defendant is in default as a result of not having paid their withdrawal liability pursuant to the terms of the Default Letter. Pursuant to ERISA § 4219(c)(5), 29 U.S.C. § 1399(c)(5), the Defendant is required to immediately pay the total outstanding amount of its withdrawal liability, plus accrued interest on the total outstanding liability from December 31, 2013, the due date of the first payment that was not timely made.

23.     To date, the Defendant has not made any payment towards satisfying the withdrawal liability and has failed to cure the default within sixty (60) days after the Notice of Default. As a result, the Pension Fund has been damaged and has been deprived of money due and owing to the Fund in the amount of $1,139,409.00.

## AS AND FOR A SECOND CLAIM OF RELIEF
### (PLAINTIFF'S CLAIM FOR DELINQUENT CONTRIBUTIONS OWED TO THE PENSION FUND)

24.     Plaintiff's repeat, reiterate and re-allege each and every allegation contained in paragraphs 1 through 23 of this Complaint, as if fully set forth herein.

25.     As an employer subject to the terms of the CBA with the Union, the Defendant had certain contractual obligations.

26.     The Agreement and/or Trust Indenture requires the Employer/Defendant to submit contribution reports setting forth the hours that each of its employees worked and the amount of contributions due pursuant to the rate schedules set forth in the Agreement for all work performed by its employees covered by the Agreement and to remit such monetary contributions

in accordance with the Agreement and the rules and regulations established in the Trust Indenture.

27.     Upon information and belief, the Employer/Defendant has failed and refused to remit fringe benefit contributions and surcharges in the approximate amount of $8,450.14 for the periods of January 2018 to December 2020 due and owing to the Pension Fund under the Agreement and in accordance with the Trust Indentures and Policy for the periods of January 2018 to December 2020 plus interest, court costs, and liquidated damages in addition to the withdrawal liability amount stated herein.

28.     These amounts described in paragraph 27 above are due and owing to the Plaintiffs and are subject to an audit by the Pension Fund.

29.     The Defendant/Employer's failure, refusal or neglect to remit the proper contributions and reports to the Plaintiffs constitutes a violation of the Agreement between the Employer/Defendant and the Union wherein the Pension Fund is a third-party beneficiary.

30.     As a result of the Defendant/Employer's delinquency, the Agreement provides that the Employer may be required to pay, in addition to the delinquency, interest, liquidated damages and court costs.

31.     Accordingly, the Defendant/Employer is liable to Plaintiffs for unpaid contributions and surcharges to the Pension Fund in the approximate amount of $8,450.14 for the periods of January 2018 to December 2020 in unpaid contributions and surcharges, plus interest, attorney's fees, liquidated damages, auditors' fees, court costs and disbursements.

**AS AND FOR A THIRD CLAIM OF RELIEF**
(PLAINTIFF'S CLAIM FOR DELINQUENT CONTRIBUTIONS OWED TO THE WELFARE
FUND)

32.     Plaintiff's repeat, reiterate and re-allege each and every allegation contained in

paragraphs 1 through 31 of this Complaint, as if fully set forth herein.

33.     As an employer subject to the terms of the CBA with the Union, the Defendant had

certain contractual obligations.

34.     The Agreement and/or Trust Indenture requires the Defendant Employer to submit

contribution reports setting forth the hours that each of its employees worked and the amount of

contributions due pursuant to the rate schedules set forth in the Agreement for all work

performed by its employees covered by the Agreement and to remit such monetary contributions

in accordance with the Agreement and the rules and regulations established in the Trust

Indenture.

35.     Upon information and belief, the Defendant Employer has failed and refused to remit

fringe benefit contributions in the approximate amount of $10,333.33 for the periods of January

2018 to December 2020 due and owing to the Welfare Fund under the Agreement and in

accordance with the Trust Indentures and Policy for the periods of January 2018 to December

2020 plus interest, court costs, and liquidated damages.

36.     These amounts described in paragraph 34 above are due and owing to the Plaintiffs and

are subject to an audit by the Welfare Fund.

37.     The Defendant Employer's failure, refusal or neglect to remit the proper contributions

and reports to the Plaintiffs constitutes a violation of the Agreement between the Employer and

the Union wherein the Welfare Fund is a third party beneficiary.

38.     As a result of the Defendant Employer's delinquency, the Agreement provides that the Defendant Employer may be required to pay, in addition to the delinquency, interest, liquidated damages and court costs.

39.     Accordingly, the Defendant Employer is liable to Plaintiffs for unpaid contributions and surcharges to the Welfare Fund in the approximate amount of $10,333.33 for the periods of January 2018 to December 2020 in unpaid contributions and surcharges, plus interest, attorney's fees, liquidated damages, auditors' fees, court costs and disbursements.

**AS AND FOR A FOURTH CLAIM OF RELIEF**
(PLAINTIFF'S CLAIM FOR DELINQUENT CONTRIBUTIONS OWED TO THE PENSION FUND AND THE WELFARE FUND)

40.     Plaintiff's repeat, reiterate and re-allege each and every allegation contained in paragraphs 1 through 39 of this Complaint, as if fully set forth herein.

41.     As an employer subject to the terms of the CBA with the Union, the Defendant had certain contractual obligations.

42.     Pursuant to ERISA, the Agreement and/or Trust Indenture, the Defendant Employer is required to timely submit current fringe benefit contributions and reports to plaintiffs.

43.     Upon information and belief, the Defendant Employer has in the past failed to timely submit current fringe benefit contributions, Union dues and reports to plaintiffs and is in breach of the statutory obligations under ERISA, the Agreement and Trust Indenture.

44.     During the course of the instant action, additional contributions and/or delinquency charges may become due and owing.  If the Defendant fails to pay the contributions and/or delinquency charges, as part of this action, at the time of trial or judgment, whichever is later, those additional amounts should be included.

**WHEREFORE**, Plaintiffs respectfully pray for Judgment against Defendant as follows:

On the First Claim for Relief:

    a.   Pension withdrawal liability in the amount of $1,139,409.00 owed to the Fund by the Plaintiff.

On the Second, Third and Fourth Claims for Relief:

    a.   Pension Benefit fund contributions and surcharges for the periods of January 2018 to December 2020, in the amount of $8,450.14, plus interest, liquidated damages, auditors' fees, court costs and disbursements to the Pension Fund as mandated by § 502(g)(D) of ERISA, 29 U.S.C. § 1132(g)(2)(D) and the Agreement;

    b.   Welfare Benefit fund contributions and surcharges for the periods of January 2018 to December 2020, in the amount of 10,333.33, plus interest, liquidated damages, auditors' fees, court costs and disbursements to the Welfare Fund as mandated by § 502(g)(D) of ERISA, 29 U.S.C. § 1132(g)(2)(D) and the Agreement;

    c.   Damages in the amount of any additional contributions and/or delinquency charges which may become due and owing to the Pension Fund and the Welfare Fund during the course of the instant action which amount shall include the principal plus interest and liquidated damages.

On all claims for relief: For such other and further relief as to the Court deems appropriate.

Dated:  Long Island City, New York
        October 26, 2021

Respectfully Submitted,

By: _____
Mark A. Torres
United Wire Metal & Machine
Pension Fund
24-09 38th Avenue
Long Island City, NY 11101
P: 212.691.7044
F: 212.633.1905
mtorres@local810.org
*Attorney for Plaintiff*

# EXHIBIT "A"

## Relevant Portions of the Collective Bargaining Agreement and the Trust Indenture for the Pension and Health Funds

**AGREEMENT BETWEEN**

**MAJESTIC RUG CLEANING COMPANY INC.**

**and**

**LOCAL 810**
**International Brotherhood of Teamsters**
**AFL-CIO**

**February 1, 2019 through January 31, 2022**

worked during such contract year.

**Article 17:**                        **Hiring Rates**

The hiring rates shall be in accordance with and no less then the applicable New York State Minimum Wage Rates.

**Article 18:**                        **Wage Increases**

1.    All employees on the payroll of the Employer on February 1, 2019 shall receive a seventy-five cents (75¢) per hour wage increase effective February 1, 2019.

2.    All employees on the payroll of the Employer on February 1, 2020, shall receive a seventy-five cents (75¢) per hour wage increase effective February 1, 2020.

3.    All employees on the payroll of the Employer on February 1, 2021, shall receive a seventy-five cents (75¢) per hour wage increase effective February 1, 2021.

**Article 19:**                        **Sick Benefits Welfare Fund**

Effective February 1, 2019, the Employer agrees to continue to contribute Six Hundred Twenty-five Dollars ($625.00), per month, per employee for each of the employees covered by this Agreement, to the United Wire, Metal and Machine Health and Welfare Fund. Effective February 1, 2021, the contribution shall be increased to Six Hundred and Forty Dollars ($640.00) per month, per employee. Contributions shall first become due and owing after an employee has completed his 90th day of employment and such payment shall not be retroactive.

Payments are to be made monthly and are to be accompanied by a list showing the name of employee, his shop number or classification, his weekly wages and the amount of the contribution. The Employer's contributions are to held, managed and administered in accordance with the current Trust Indenture, or as amended hereafter, of the said United Wire, Metal and Machine Health and Welfare Fund, the terms of which the Employer hereby ratifies. The Employer agrees to furnish to the Fund, all records pertaining to the names of employees, social security numbers, amount of wages paid, number of hours worked, family status, new employees hired, employees whose services are terminated, and such other information as may be required by any underwriting insurance company, or by the Fund, for the proper administration thereof.  The Employer's payroll and other pertinent records may be examined by the Union or the Fund, or their representatives, at reasonable hours, on demand.

It is expressly agreed that the Union and/or the United Wire, Metal and Machine Pension Fund shall have the right to cover its or their employees in the United Wire, Metal and Machine Health and Welfare Fund but neither the Union nor, the United Wire, Metal and Machine Pension Fund shall participate in the selection of Employer Trustees of the United Wire, Metal and Machine Health and Welfare Fund.  The Welfare Fund may provide coverage for its own employees.

It is expressly understood and agreed that the contributions to the United Wire, Metal and Machine Health and Welfare Fund as herein provided shall not obligate the said Fund to provide the coverage required by the New York State Disability Benefits Law.  Said required benefits shall be provided independently by the Employer without any deductions from or contributions by the employees.

**Article 20:**                                **Pension Fund**

1.  The Employer agrees to continue to contribute to the Local 810 Affiliated Pension Plan, seven percent (7%) of gross earnings, for each employee covered by this Agreement hired prior to February 1, 2007. Contributions for employees hired on or after February 1, 2007 shall be paid at the rate of six percent (6%) of gross earnings. Anything to the contrary contained in said Pension Plan notwithstanding, it is agreed that no coverage or benefits under said Pension Plan shall accrue or become payable to an employee until such time as such employee shall have been in the employ of the Employer for a period of three (3) months, after which time such coverage or benefits shall commence. Contributions are payable monthly within ten (10) days after termination of each calendar month.

2.  The funds of the Pension Plan shall be held and managed under the terms and conditions of the Agreement and Declaration of Trust dated November 15, 1969, and all amendments thereto.

**Article 21:**                                **Rest/Coffee Break**

All employees shall be granted a combination rest and coffee break period not to exceed twenty (20) minutes each day of the week.

**Article 22:**                                **Mourning Leave**

In case of death in the immediate family (mother, father, wife, husband, son, daughter, brother or sister) any employees affected shall have three (3) days off with pay. Proof of death may be required by the Employer.

**Article 23:**                                **Non-Discrimination**

In accordance with applicable law, the Employer and the Union agree not to discriminate against any individual with respect to hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, sex, national origin, handicap, pregnancy or age, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of race, color, religion, sex, national origin, handicap, pregnancy or age.

The Company and the Union agree that there will be no discrimination by the Company or the Union against any employee because of his or her membership in the Union or because of any employee's lawful activity and/or support of the Union.

The term "he" or "his" as used in this Agreement is not meant to be discriminatory and shall apply equally to male and female employees.

**Article 24:**                                **Seniority**

1.  Seniority for the purpose of this Agreement shall apply only among regular employees covered by this Agreement. Regular employees laid off shall be so laid off when feasible, according to plantwide seniority, and in accordance with the needs of the business, and when rehired shall be rehired in the order of their seniority and in accordance with the needs of the business.

2.  Upon a newly hired employee successfully completing his probationary period, seniority shall be measured from such employee's first day of employment.

**IN WITNESS WHEREOF** this Agreement has been duly executed by the parties.

MAJESTIC RUG CLEANING COMPANY

By: _Jeffrey Seidel_

LOCAL 810, affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS

By: _____

Michael Smyth, President

Recommended by:

Nelson Silva, V.P./Business Agent

Committee:

_____

_____

_____

_____

_____

# AGREEMENT AND DECLARATION OF TRUST

## ESTABLISHING THE TRUST FUND OF THE

## LOCAL 810 AFFILIATED PENSION PLAN

**(As Amended and Restated Effective as of November 2001)**

## AGREEMENT AND DECLARATION OF TRUST
## ESTABLISHING THE TRUST FUND OF THE LOCAL 810
## AFFILIATED PENSION PLAN

**THIS AGREEMENT AND DECLARATION OF TRUST**, amended and restated as of the 8th day of November, 2001, establishing the TRUST FUND OF THE LOCAL 810 AFFILIATED PENSION PLAN (the "Fund"), by and among LOUIS SMITH AND STEVEN G. GILMAN (who, with their successors designated in the manner provided herein, are hereinafter collectively referred to as the "Union Trustees") on behalf of LOCAL 810 OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL-CIO ("Local 810") (as successor in interest to International Brotherhood of Teamsters Local 875 ("Local 875")) (the "Union"); and ROY BARNES (who, with his successors designated in the manner provided herein, are hereinafter collectively referred to as the "Employer Trustees") on behalf of the Employers contributing to the Plan (collectively, the "Employers") (the Union Trustees and the Employer Trustees being hereinafter collectively referred to as the "Trustees").

## W I T N E S S E T H:

**WHEREAS**, the Employers and the Union have executed, and may from time to time hereafter execute, collective bargaining agreements, participation or similar agreements (collectively, "Collective Bargaining Agreements") which, among other things, require periodic Employer contributions to the Fund; and

**WHEREAS**, the Employers and Local 875 entered into the Agreement and Declaration of Trust establishing the Local 875 I.B.T. Pension Fund ("Local 875 Fund"), dated November 15, 1960, and as from time to time thereafter amended (the "Existing Trust"), the assets of which were used for the exclusive purpose of (a) providing pension and retirement benefits to certain employees of the Employers ("Covered Employees") eligible to participate in the Local 875 Fund, and their dependents or beneficiaries ("Beneficiaries"); and (b) for defraying the reasonable administrative and other expenses of such Fund; and

**WHEREAS,** Local 875 was merged into Local 810 on March 8, 1998, and Local 875 ceased to exist as a labor organization as of such date;

**WHEREAS,** Local 810 succeeded to the rights, title and interests of Local 875, including Local 875's sponsorship of the Local 875 Fund, which name will be amended by virtue of this Agreement to the Local 810 Affiliated Pension Fund;

**WHEREAS,** it was and continues to be mutually agreed among the Employers and the Union that the Fund and the Local 810 Affiliated Pension Plan shall be established, operated and administered by the Trustees; and

**WHEREAS,** the Trustees now desire to amend and restate the Existing Trust, to restate, <u>inter alia</u>, the powers, duties, authorities and responsibilities of the Trustees and to reflect the merger of Local 875 into Local 810;

**NOW, THEREFORE,** for and in consideration of the promises and mutual covenants herein contained, it is hereby mutually understood and agreed by the Trustees, the Employers, and the Union as follows:

## ARTICLE I

## <u>DEFINITIONS</u>

Whenever used in this Agreement, unless the context otherwise requires, the following words shall have the respective meanings set forth below:

1.1     **"Administrator"** shall mean the Board or any entity or individual(s) duly authorized by the Board to administer the Fund or the Plan. The Board, and not the

## ARTICLE IX

**[to be compared to collection procedures]**

## PAYMENTS TO THE FUND

9.1 <u>Employer Contributions</u>.

(a)     In order to carry out the purpose hereof, the Employers shall contribute to the Trust Fund the amount required by the applicable Collective Bargaining Agreements at any time in force and effect between the Union and an Employer.

(b)     Nothing in this Trust Agreement shall be deemed to change, alter or amend any of the terms or provisions of any such Collective Bargaining Agreements regarding the rate and amount of contributions.

9.2 <u>Effective Date of Employer Contributions</u>.  All contributions shall be made effective as of the date specified in the applicable Collective Bargaining Agreements between the Union and the Employer, and said contributions shall continue to be paid as long as the Employer is so obligated pursuant to said Collective Bargaining Agreements.

9.3 <u>Mode of Payment</u>.  All contributions shall be made payable to "Local 810 Affiliated Pension Fund" or shall be paid in such other manner and form as may be prescribed by the Board.

9.4 <u>Default in Payment</u>.

(a)     Employer payments to the Trust Fund are due no later than:

(1)     the due date for such contributions as set forth in the applicable Collective Bargaining Agreements (or related agreements), but no later than the last day of the month immediately following the calendar quarter in which the Covered Employee performed the services for which such contributions are due and payable to the Trust Fund; or

(2)     with respect to any such agreements that do not specify a due date for Employer contributions to the Trust Fund, the last day of the month immediately following the month in which the Covered Employee performed the services for which such contributions are due and payable to the Trust Fund, or any other time specified by the Trustees.

(b)     In addition to any other enforcement remedies that may exist under this Agreement, any applicable Collective Bargaining Agreements, or any other agreement requiring contributions to the Trust Fund, the Board is authorized and empowered to initiate whatever actions or proceedings may be proper and necessary in their sole and absolute discretion for the

enforcement of an Employer's contribution obligations to the Trust (including, but not limited to, proceedings at law or in equity, arbitration and any other remedies that generally would be available for the enforcement of said obligation to contribute to the Trust Fund).

(c)　　In the event that any Employer shall fail to make required Employer contributions or other payments to the Trust Fund when due, the Board may and is empowered, in its sole and absolute discretion, to terminate, on a prospective basis, the participation of the Employer in the Plan and Trust Fund, and the crediting of future service credit to Employees of such terminated Employer. Nothing in this Section 9.4(c) shall affect or otherwise modify the ability of the Board to assert and enforce any and all other rights (as may be set forth in this Agreement, the Plan or any Collective Bargaining Agreement, or as may be provided by applicable law) against such Employer for the collection of any delinquent Employer contributions to the Plan or Trust Fund (including, but not limited to, those rights and actions set forth in this Article).

(d)　　A delinquent Employer shall be liable for all costs and expenses incurred in effectuating its contributions or other payments due to the Trust Fund including but not limited to:

(1)　　arbitration expenses;

(2)　　attorneys' fees;

(3)　　court costs;

(4)　　all other costs and expenses attributable to the collection of such contributions or other payments; and

(5)　　interest equal to the annual prime rate of interest quoted in The New York Times as of the date on which the Employer's contributions were due and payable to the Trust Fund as determined pursuant to this Section 9.4 of this Agreement (or the next business day, if such date is not a business day), plus five percent.

(e)　　In addition to the right to assess an Employer with audit costs provided in Section 9.8(g), the Board shall also have the right to assess an Employer with all reasonable costs and expenses (including, without limitation, all audit, accounting, and legal fees) attributable to the audit of the Employer's payroll, wage, and related business records with respect to the contributions or other forms of payment which the Employer is obligated to make to the Fund.

9.5 <u>Enforcement Actions</u>. In addition to any other remedies to which the Board may be entitled hereunder, in the event that an Employer fails to make required contributions to the Trust Fund, in accordance with the terms and conditions of this Agreement and any rules or guidelines promulgated by the Board pursuant hereto (hereinafter collectively referred to as "Unpaid Contributions"), the Board may bring an action on behalf of the Trust Fund pursuant to Section

502(g)(2) and 515 of ERISA to enforce the Employer's obligation to contribute to the Trust Fund.

9.6   <u>Payments Required by Court Award</u>.  In any action under this Article IX in which a judgment is awarded by a court in favor of the Plan, the Trust, or the Board, the Employer shall pay to such party, in accordance with the court's award, the following amounts:

    (a)   all unpaid contributions due and payable; plus

    (b)   interest on such unpaid contributions (computed in accordance with the method set forth in Section 9.4(d) of this Article IX); plus

    (c)   an amount equal to the greater of:

        (1)   the interest on the unpaid contributions (computed in accordance with the method set forth in Section 9.4(d) of this Article IX), or

        (2)   twenty percent (20%) of the unpaid contributions; plus

    (d)   attorneys' fees, costs of the action, reasonable expenses attributable to any audit of the Employer's payroll, wage, and related business records with respect to unpaid contributions or payments, and any other related expenses; and

    (e)   such other legal or equitable relief as the court deems appropriate.

9.7   <u>No Waiver of Other Rights</u>.

    (a)   The failure of any Employer to make Employer contributions to the Trust Fund when due shall not relieve any other Employer of its obligations to make Employer contributions to said Trust.

    (b)   Nothing in this Article IX shall be construed as a waiver or limitation on the right of the Plan, the Trust, or the Board to enforce an Employer's contribution obligation in any other type of proceeding, and the provisions of this Article IX shall be without prejudice to the rights of the Union to enforce the provisions of any Collective Bargaining Agreement to which it is a party.

9.8  Remittance Reports and Audits.

(a)      All Employers shall make contributions to the Fund, together with any remittance or other reports prescribed by the Board or the Administrator, in such form and manner as may be required by the Board or the Administrator including, without limitation, providing information concerning the Employer and, if applicable, any payroll company or other company, partnership, person, organization or entity affiliated with such Employer (hereinafter collectively referred to as the "Employer"), as well as all Employee names, addresses, social security numbers, local union affiliations, engagement date(s), and "scale wage" and contribution amounts.  The Employer shall submit to the Fund separate remittance or other reports for each type of engagement.

(b)      The Board (or the Administrator, if authorized by the Board) shall be authorized and empowered to initiate on behalf of the Fund whatever action(s) or proceeding(s) may be proper and necessary in its sole and absolute discretion for the enforcement of an Employer's contribution obligations to the Trust (including, but not limited to, periodic audits or other forms of examination of an Employer's books and records, enforcement and/or collection proceedings).

(c)      The Board (or the Administrator, if authorized by the Board) shall have the right to designate an accountant, attorney or other representative of the Fund (a "Fund Representative") periodically to examine, copy and audit, and the Employer agrees to permit such Fund Representative to conduct such periodic examinations and audits of, the Employer's accounts, books and records at the Employer's place of business (or other mutually agreed upon location) which the Fund Representative determines is necessary to confirm that the Employer has fully satisfied its obligations to contribute to the Fund under the Employer's Collective Bargaining Agreement (or any other agreement requiring contributions to the Fund), this Agreement, the Plan, the rules and policies of the Trustees, or under applicable law.

(d)      The Fund Representative shall have the right to examine all of the Employer's accounts, books and records including, without limitation, all check registers; payroll registers; general, production cost and other ledgers; royalty statements; vouchers; payroll tax deductions; calculations supporting "scale wage" determinations; IRS Forms 1096, 1099, W-2 and W-3; state employment reports; evidence of unemployment insurance contributions; insurance company reports; supporting canceled checks; disability insurance premiums; certification of workers' compensation coverage; personnel files and/or other documentation supporting employee job classifications; and any other items concerning the Employer's payroll(s) or contributions to the Fund deemed necessary by such Fund Representative to determine the accuracy, completeness, and timeliness of the Employer's contributions and payments to the Fund (all of which are hereinafter collectively referred to as "Records").  The Employer's Records shall be made available at the Employer's place of business at all reasonable times for examination, audit, and copying (at the Employer's expense) by such Fund Representative .  In addition, the Records of any affiliate, subsidiary, alter ego, joint venture, successor or related company of the Employer (including, where applicable, payroll companies)

shall also be made available at all reasonable times for examination and audit by the Fund's Representative, at the request of said Fund Representative.

(e)     The Employer shall retain, for a minimum period of six (6) years or such longer period as may be required by applicable law (whichever is greater), all Records necessary for the conduct of the examination and audit contemplated in this Article IX (including, but not limited to, such Records and other documents as listed herein above).

(f)     An Employer shall be entitled to thirty (30) days' advance written notice of any audit to be conducted under this Article IX. If, however, exigent circumstances exist for conducting the audit on shorter notice, the Fund Representative may do so, provided that it gives the Employer advance written notice of such audit. The Employer shall be permitted to adjourn the audit for up to ten (10) business days (provided that the Employer gives the Fund Representative requesting the audit with no less than ten (10) business days' advance written notice of its need for an adjournment).

(g)     In the event that the Fund Representative has provided proper and timely notice of the audit to the affected Employer in accordance with Section 9.8(f) above, but the Employer nonetheless fails to produce the Records necessary for an audit as set forth in this Article IX, and the Fund brings and prevails in a legal action against said Employer to obtain an audit of said Employer's Records, said Employer shall be obligated to pay the reasonable costs and attorneys' fees incurred in pursuing said action, together with the full cost of such audit (without regard to any of the limitations or other conditions on the amount that can be assessed against such Employer set forth in Section 9.4(e) of this Article IX). In any such action, the affected Employer consents to jurisdiction in the Federal District Court for the Southern District of New York.

(h)     The Employer shall bear all of its own costs of the audit.

AGREEMENT AND DECLARATION OF TRUST

AMENDING AND RESTATING THE

UNITED WIRE, METAL AND MACHINE

HEALTH AND WELFARE FUND

(Effective as of January 1, 1995)

### AMENDED AND RESTATED AGREEMENT AND DECLARATION OF TRUST ESTABLISHING THE UNITED WIRE, METAL AND MACHINE HEALTH AND WELFARE FUND

THIS AGREEMENT AND DECLARATION OF TRUST, amended and restated as of the 1st day of January, 1995, establishing the UNITED WIRE, METAL AND MACHINE HEALTH AND WELFARE FUND (the "Fund"), by and among (a) JOSEPH PADELLARO, THOMAS FEELEY, and DONNA SANTORO (who, with their successors designated in the manner provided herein, are hereinafter collectively referred to as the "Union Trustees") as Union Trustees; and (b) HOWARD LEVY, BURTON K. LEWIS and ISIDORE ROTHMAN (who, with their successors designated in the manner provided herein, are hereinafter collectively referred to as the "Employer Trustees") as Employer Trustees (the Union Trustees and the Employer Trustees being hereinafter collectively referred to as the "Trustees").

### W I T N E S S E T H:

WHEREAS, the Employers contributing to the Plan (the "Employers") and Local 810, Steel, Metal, Alloys and Hardware Fabricators and Warehousemen, affiliated with the International Brotherhood of Teamsters (the "Union") have executed, and may from time to time hereafter execute, collective bargaining agreements, participation or similar agreements (collectively, "Collective Bargaining Agreements") which, among other things, require periodic Employer contributions to the Fund; and

## ARTICLE IX

### PAYMENTS TO THE FUND

9.1  Employer Contributions.

(a)  The Employers shall contribute to the Trust Fund the amount required by the applicable Collective Bargaining Agreements at any time in force and effect between the Union and an Employer.

(b)  The rate and amount of contribution shall at all times be based only on scale wages earned by Covered Employees and governed by said Collective Bargaining Agreements, together with any amendments, supplements, and modifications thereto.

9.2  Mode of Payment.  All contributions shall be made payable to "United Wire, Metal and Machine Health and Welfare Fund," or shall be paid in such other manner and form as may be prescribed by the Board.

9.3  Default in Payment.

(a)  Employer payments to the Trust Fund are due no later than:

(1)  the due date for such contributions as set forth in the applicable Collective Bargaining Agreements (or related agreements); or

(2)  with respect to any such agreements that do not specify a due date for Employer contributions to the Trust Fund, the fifteenth day of the month immediately following the month for which contributions are payable to the Trust Fund.

42

(b)   In addition to any other enforcement remedies that may exist under any applicable Collective Bargaining Agreements, the Board is authorized and empowered to initiate whatever actions or proceedings may be proper and necessary in their sole and absolute discretion for the enforcement of an Employer's contribution obligations to the Trust (including, but not limited to, proceedings at law or in equity, arbitration and any other remedies that generally would be available for the enforcement of said obligation to contribute to the Trust Fund).

(c)   In the event that any Employer shall fail to make required Employer contributions to the Trust Fund when due, the Board may and is empowered, in its sole and absolute discretion, to terminate, on a prospective basis, the participation of the Employer in the Plan and Trust Fund, and the crediting of future service credit to Employees of such terminated Employer. Nothing in this Section 9.4(c) shall affect or otherwise modify the ability of the Board to assert and enforce any and all other rights (as may be set forth in this Agreement, the Plan or any Collective Bargaining Agreement, or as may be provided by applicable law) against such Employer for the collection of any delinquent Employer contributions to the Plan or Trust Fund (including, but not limited to, those rights and actions set forth in this Article).

(d)   A delinquent Employer shall be liable for all costs and expenses incurred in effectuating its contributions or other payments due to the Trust Fund including but not limited to:

(1)   arbitration expenses;

(2)   attorneys' fees;

(3)   court costs;

(4)   all other costs and expenses attributable to any audit of the Employer's payroll, wage, and related business records with respect to unpaid contributions or payments; and

(5)   interest equal to the annual prime rate of interest quoted in The Wall Street Journal as of the first day of the month in which the Employer's contributions were due and payable to the Trust Fund as determined pursuant to this Section 9.4 of this Agreement, plus one percent.

9.4   _Enforcement Actions_.   In addition to any other remedies to which the Board may be entitled hereunder, in the event that an Employer fails to make required contributions to the Trust Fund, in accordance with the terms and conditions of this Agreement and any rules or guidelines promulgated by the

Board pursuant hereto (hereinafter collectively referred to as "Unpaid Contributions"), the Board may bring an action on behalf of the Trust Fund pursuant to Section 502(g)(2) and 515 of ERISA to enforce the Employer's obligation to contribute to the Trust Fund.

9.5 <u>Payments Required by Court Award</u>. In any action under this Article IX in which a judgment is awarded by a court in favor of the Plan, the Trust, or the Board, the Employer shall pay to such party, in accordance with the court's award, the following amounts:

(a) all Unpaid Contributions due and payable; plus

(b) interest on such Unpaid Contributions (computed in accordance with the method set forth in Section 9.4(d) of this Article IX); plus

(c) an amount equal to the greater of:

(1) the interest on the Unpaid Contributions (computed in accordance with the method set forth in Section 9.4(d) of this Article IX), or

(2) twenty percent (20%) of the Unpaid Contributions; plus

(d) attorneys' fees, costs of the action, reasonable expenses attributable to any audit of the Employer's payroll, wage, and related business records with respect to unpaid contributions or payments, and any other related expenses; and

(e) such other legal or equitable relief as the court deems appropriate.

9.6 <u>No Waiver of Other Rights</u>.

(a) The failure of any Employer to make Employer contributions to the Trust Fund when due shall not relieve any other Employer of its obligations to make Employer contributions to said Trust.

(b) Nothing in this Article IX shall be construed as a waiver or limitation on the right of the Plan, the Trust, or the Board, to enforce an Employer's contribution obligation in any other type of proceeding, and the provisions of this Article IX shall be without prejudice to the rights of the Union to enforce the provisions of any Collective Bargaining Agreement to which it is a party.

9.7 <u>Remittance Reports and Audits</u>.

44

(a)   All Employers shall make contributions to the Fund, together with any remittance or other reports prescribed by the Board, in such form and manner as may be required by the Board.

(b)   The Board (or their duly authorized representatives) may at any time make an audit of the payroll, wage, and related business records and/or reports of any Employer with respect to the contributions or other forms of payments due the Fund.   Each Employer shall make available to the Board (or their authorized representatives) all records deemed necessary by such persons to determine the accuracy, completeness, and timeliness of such contributions, payments or reports.

(c)   The Board shall have the right to assess an Employer with all reasonable costs and expenses (including, without limitation, all audit, accounting, and legal fees) attributable to the audit of the Employer's payroll, wage, and related business records with respect to the contributions or other forms of payment which the Employer is obligated to make to the Fund in the event that the Board has determined that such Employer has been delinquent in remitting contributions or payments to the Fund.

45

# EXHIBIT "B"

## January 7, 2021 Notice and Demand Letter for Payment of Pension Withdrawal Liability

# Local 810 Affiliated Pension Fund

24-09 38th Avenue • Long Island City, NY 11101
(212) 691-4100 Ext. 313

January 7, 2021

**<u>Certified Mail Return Receipt Requested</u>**

Majestic Rug Cleaning Company, Inc.
644 Whittier Street
Bronx, NY 10474

Re:     **Notice and Demand for Payment of Withdrawal Liability-**
        **<u>Local 810 Affiliated Pension Fund</u>**

Gentlemen:

We have been advised that Majestic Rug Cleaning Company, Inc. (the "Company") will have permanently ceased all covered operations under the Local 810 Affiliated Pension Fund (the "Fund") as of December 31, 2020.  As a result, the Company will have effected a complete withdrawal from the Fund within the meaning of Section 4203 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Consequently, the Company is subject to the payment of withdrawal liability to the Fund, and in accordance with the requirements of Section 4202 and 4219(b)(1) of ERISA, the Board of Trustees of the Fund (the "Trustees") hereby makes demand for payment of withdrawal liability, as described below.

In accordance with the Fund's method of computing withdrawal liability we have determined the Company's estimated withdrawal liability to the Fund to be:

**ONE MILLION ONE HUNDRED THIRTY-NINE THOUSAND FOUR HUNDRED NINE DOLLARS ($1,139,409.00)\***

**\*Please note that this calculation will be revised upon completion of the January 1, 2020 actuarial valuation.**

Under Sections 4219(c) of ERISA, the Company is required to pay the full value of its withdrawal liability in eighty (80) quarterly installments (four installment payments per year), in the amount of $4,196.00 as limited by statute.  Please find enclosed a payment schedule setting forth the Company's required withdrawal liability payments.  Please note that interest on each such payment shall accrue until the date on which payment is actually made.  This payment schedule is limited to a 20 year maximum as prescribed in ERISA 4219(C)(1)(B).  Once the allocable withdrawal liability is finalized, only the number of payments and the final payment amount may change.

Pursuant to Section 4219(a) of ERISA, it is hereby requested that the Company advise the undersigned, within 30 days of the date of this Notice, whether the Company is or was a member of a trade or business "under common control" within the meaning of Sections 414 and 153 of the Internal Revenue Code of 1986, as amended (i.e., a "controlled group"). If the Company is or was a member of a controlled group, it is hereby requested that the Company furnish the undersigned with the corporate (or business) names and addresses of each organization within the controlled group. Please also note whether any of these organizations contributed to the Fund at any time.

If you have any questions, please contact the undersigned.

Sincerely,
**Board of Trustees of the**
**LOCAL 810 AFFILIATED PENSION FUND**

By:   Lorraine Buonacore
Administrator

Enclosure

cc:   Matthew Scher
Mark Torres, Esq
Michael Smith, Local 810

Pursuant to Section 4219(c)(2) of ERISA, payment of withdrawal liability to the Fund is required to commence no later than 60 days after the date of this Notice, "notwithstanding any request for review or appeal of determinations of the amount of such liability." Thus, the Company's initial quarterly withdrawal liability payment is due on February 28, 2021. Payment of withdrawal liability should be made directly to the order of "Local 810 Affiliated Pension Fund" and forwarded to the undersigned at the address above.

Failure to commence payment of withdrawal liability or to make timely subsequent payments, as required under ERISA, will constitute "default" within the meaning of Section 4219(c)(5) of ERISA, and will entitle the Fund to require immediate payment of the full amount of withdrawal liability owed to the Fund by the Company, plus accrued interest. The Fund will assess such default penalties on the entire amount of the Company's withdrawal liability, as well as any court costs and attorneys' fees incurred in collecting such delinquency.

Under Section 4219(b)(2)(A) of ERISA, the Company has the right, within 90 days after the receipt of this Notice to:

(1)     Request the Trustees to review any specific matter relating to the determination of the Company's withdrawal liability and the schedule of payments described herein;

(2)     Identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the Company; and

(3)     Furnish any additional relevant information to the Trustees.

Pursuant to Section 4221 of ERISA, any dispute arising out of the Fund's determination and review must be resolved through arbitration. Either party may initiate the arbitration proceeding herein within a 60-day period after the earlier of:

(a)     the date of the Fund's notification to the Company under Section 4219(b)(2)(B) of ERISA, or

(b)     120 days after the date of the Company's request under Section 4219(b)(2)(A) of ERISA

**Under Section 4219(c)(2) of ERISA, the Company must commence payments demanded herein in accordance with the terms and schedule set forth above, notwithstanding any request for review or appeal of determinations.**

## Local 810 Affiliated Pension Fund

**Report on Potential Employer Withdrawal Liability**
**Assumed Withdrawal Date**
**in the year ended December 31, 2019**

**Majestic Rug**

Copyright © 2020
THE SEGAL GROUP, INC.,
ALL RIGHTS RESERVED

## Local 810 Affiliated Pension Fund

### I.    General – Amount of Withdrawal Liability

When an employer withdraws, the Trustees must determine the amount of the employer's withdrawal liability. This is based essentially on the extent of the Plan's unfunded vested benefits at the time of withdrawal. Plans in critical status must disregard certain benefit reductions in determining the plan's unfunded vested benefits for purposes of determining an employer's withdrawal liability. The withdrawal formula assigns a share of that unfunded liability to the employer that has withdrawn.

The Trustees of Local 810 Affiliated Pension Fund have adopted the statutory formula provided in the Multiemployer Pension Plan Amendments Act of 1980 and the "simplified method" defined in PBGC Technical Update 10-3 for determining the impact of the Plan's critical status benefit reductions.

The statutory formula distinguishes between the employers who are participating now and employers who participate in the future. It prorates the current unfunded liability for vested benefits only among employers currently contributing. The proration for each employer is based on its contributions in relation to the total made by all continuing employers over the preceding five years.

An employer coming into the Plan in future years will not have a share, should it withdraw, in liabilities accumulated before it entered. Each year, the Plan must determine the annual change in its unfunded vested liability. It then prorates each year's change to each of the then participating employers in proportion to their contributions in the preceding five years. If at some point an employer withdraws, the amount of its liability is the sum of what remains of the annual allocations. Each portion is reduced to the point of withdrawal by 5% a year.

In addition, an employer is allocated a share of the impact of critical status reductions. The adopted "simplified method" described in PBGC Technical Update 10-3 accounts for the effect of adjustable benefit reductions that are implemented as part of a Rehabilitation Plan when a plan is in critical status. Each year, an Affected Benefits pool is established equal to the value of the

1

adjustable benefit reductions and is amortized in level annual installments over 15 years. The simplified method provides that the withdrawing employer is allocated a portion of the unamortized balance of the Affected Benefits pool based on the ratio of the employer's obligated contributions in the five-year period prior to withdrawal.

In addition, withdrawing employers are charged with prorated shares of "non-assessable" or "uncollectible" liabilities that are reallocated. Each annual reallocated amount is also written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the Plan year preceding withdrawal.

2

II.     **Actuary's Assumptions and Methods of Withdrawal Liability Valuations**

The actuarial assumptions to be used are the valuation assumptions used for plan funding, except for the investment return rate and the expense charge. To the extent the assets, valued at market, cover the vested benefits, benefits will be valued at an investment return rate consistent with current annuity rates; the portion of the benefits that is not yet funded will be valued on the interest assumptions used for plan funding.

Specifically, the withdrawal liability valuation assumptions and methods are:

1. **Investment Return**

   Same as used for plan funding

2. **Mortality**

   Same as used for plan funding

3. **Expenses**

   No separate expense charge

4. **Retirement Rates**

   Same as used for plan funding

5. **Assets**

   Valued at fair market value as reported in the Plan's financial statements as of December 31, 2018 filed with the IRS adjusted to exclude withdrawal liability receivables

The Plan's funding assumptions are shown in the Certificate of Actuarial Valuation which is attached to the Schedule MB of the Form 5500.

3

### III.    The Plan's Unfunded Vested Liabilities

The Plan's unfunded liabilities for vested benefits were determined with respect to the data supplied to us by the Fund Office as to active employees, pensioners, inactive vested employees and financial data prepared by the Fund Auditor. The calculations were done using the methodology and assumptions outlined in the actuarial certifications and the plan of benefits in effect as of each valuation date.

As explained earlier, an employer's withdrawal liability is determined by adding up the balances (as of the preceding Plan Year end) of the unfunded liabilities and of any reallocated uncollectibles. "Balances" refers to the fact that each figure is written down by 5% for each year that passed. Each balance is prorated to each employer based on the ratio of the employer's obligated contribution in each five-year period.

Beginning April 1, 2013, certain "affected benefits" were reduced. Affected benefits are otherwise nonforfeitable benefits that are reduced in accordance with a rehabilitation plan. In accordance with the Internal Revenue Code, these reductions must be disregarded in determining an employer's withdrawal liability. The Trustees have approved the use of the simplified method described in PBGC Technical Update 10-3 to account for these benefits. This simplified method provides that the withdrawing employer is allocated a portion of the unamortized balance of the Affected Benefits pool based on the ratio of the employer's obligated contribution in the five-year period prior to withdrawal. The Affected Benefits pools are amortized in level annual installments over 15 years at the Plan's funding interest rate.

The following table, Table 1, shows the unfunded liability for vested benefits, as calculated for withdrawal liability purposes, for the indicated years. Also shown is the chargeable change by each year after the effective date of withdrawal liability. Table 1 is the basis and contains the figures on which withdrawal liability for employers who withdraw on or after January 1, 2019 and on or before December 31, 2019 is determinable.

4

**Table 1**
Withdrawal Liability Pools

| Year | Unfunded Vested Benefits at December 31,* | Chargeable Change at December 31,** | Unamortized Balance of Chargeable Change at December 31, 2018 |
|---|---|---|---|
| 1999 | - | - | - |
| 2000 | - | - | - |
| 2001 | - | - | - |
| 2002 | - | - | - |
| 2003 | - | - | - |
| 2004 | - | - | - |
| 2005 | $4,567,093 | $4,567,093 | $1,598,483 |
| 2006 | 8,710,759 | 4,372,021 | 1,748,808 |
| 2007 | 10,347,709 | 2,083,905 | 937,757 |
| 2008 | 35,025,851 | 25,229,293 | 12,614,647 |
| 2009 | 35,545,603 | 2,332,368 | 1,282,802 |
| 2010 | 33,175,048 | (441,322) | (264,793) |
| 2011 | 43,271,902 | 12,004,023 | 7,802,615 |
| 2012 | 46,776,000 | 6,011,467 | 4,208,027 |
| 2013 | 38,837,528 | (5,130,531) | (3,847,898) |
| 2014 | 47,834,039 | 11,547,928 | 9,238,342 |
| 2015 | 57,319,241 | 12,614,014 | 10,721,912 |
| 2016 | 60,794,553 | 7,234,824 | 6,511,342 |
| 2017 | 55,566,816 | (1,106,482) | (1,051,158) |
| 2018 | 67,192,225 | 15,691,339 | 15,691,339 |
| | | Total unamortized balance | $67,192,225 |

\*      For the years ended December 31, 2013 and later, the unfunded vested liability and resulting base pools exclude the liability for any affected benefits. The liability for affected benefits is maintained in separate pools, as shown in Table 2.

\*\*     The chargeable change for a year is equal to the unfunded vested benefits less the sum but not less than zero, of the previous year's unamortized balances.

**IV.**     **Affected Benefits Pools**

Effective April 1, 2013, the unfunded vested liability used to develop the basic pools excludes the value of adjustable benefit reductions. Each year the value of adjustable benefit reductions is established separately as an "Affected Benefit" pool under the simplified method described in PBGC Technical update 10-3, as adopted by the Trustees.

The following table, Table 2, shows the Affected Benefit pools, as calculated for withdrawal liability purposes, for the indicated years. Original amount of each pool, the years remaining as of December 31, 2018 and the outstanding balance of each pool as of December 31, 2018 are shown.

**Table 2**
Affected Benefit Pools

| Year | Original Amount | Years Remaining as of December 31, 2018 | Outstanding Balance as of December 31, 2018 |
|------|-----------------|------------------------------------------|----------------------------------------------|
| 2013 | $-0- | N/A | $-0- |
| 2014 | -0- | N/A | -0- |
| 2015 | -0- | N/A | -0- |
| 2016 | -0- | N/A | -0- |
| 2017 | 14,141 | 14 | 13,600 |
| 2018 | -0- | N/A | -0- |

**V.**   <u>**Estimated Withdrawal Liability for Majestic Rug**</u>

Contribution information for this employer was received from the Fund Office as follows:

**Table 3**

| For Year Ended December 31, | Contributions |
|---|---|
| 2001 | $18,967.02 |
| 2002 | 20,070.89 |
| 2003 | 19,399.30 |
| 2004 | 19,476.74 |
| 2005 | 19,554.17 |
| 2006 | 19,104.71 |
| 2007 | 18,116.28 |
| 2008 | 17,376.74 |
| 2009 | 15,382.62 |
| 2010 | 16,561.25 |
| 2011 | 17,166.46 |
| 2012 | 16,624.22 |
| 2013 | 14,626.71 |
| 2014 | 14,055.36 |
| 2015 | 13,956.65 |
| 2016 | 15,618.28 |
| 2017 | 15,658.22 |
| 2018 | 15,868.82 |

Based on a date of withdrawal during year ended December 31, 2019, the estimation of allocable share of unfunded vested benefits for Majestic Rug is as follows:

**Table 4**

| Year ended December 31, | (1) Change in unfunded vested benefits amortized to December 31, 2018 | (2) Uncollectibles amortized to December 31, 2018 | (3) Critical Status Affected Benefit Pool amortized to December 31, 2018 | (4) Withdrawing employer | (5) All employers | (6) Allocable share of unfunded vested benefits ((1) + (2) + (3)) x (4) / (5) |
|---|---|---|---|---|---|---|
| | | | | Total Contributions for the 5-year period ended December 31, | | |
| 2005* | 1,598,483 | - | | 97,468 | 14,561,924 | 10,699 |
| 2006 | 1,748,808 | - | | 97,606 | 12,947,200 | 13,184 |
| 2007 | 937,757 | - | | 95,651 | 11,055,853 | 8,113 |
| 2008 | 12,614,647 | - | | 93,629 | 4,687,478 | 251,969 |
| 2009 | 1,282,802 | - | | 89,535 | 4,656,459 | 24,666 |
| 2010 | (264,793) | - | | 86,542 | 4,732,537 | (4,842) |
| 2011 | 7,802,615 | - | | 84,603 | 4,757,710 | 138,748 |
| 2012 | 4,208,027 | - | | 83,111 | 4,600,651 | 76,018 |
| 2013 | (3,847,898) | - | | 80,361 | 4,548,961 | (67,976) |
| 2014 | 9,238,342 | - | | 79,034 | 4,598,738 | 158,770 |
| 2015 | 10,721,912 | - | | 76,429 | 4,584,582 | 178,744 |
| 2016 | 6,511,342 | - | | 74,881 | 4,569,966 | 106,691 |
| 2017 | (1,051,158) | - | | 73,915 | 4,532,637 | (17,142) |
| 2018 | 15,691,339 | - | 13,600 | 75,157 | 4,509,113 | 261,767 |

(7) Total allocable share of unfunded vested benefits (sum of column (6))          $1,139,409

(8) De minimis amount (see Section VI)          -

(9) Estimated net allocable share of unfunded vested benefits (7) — (8)**          $1,139,409

\*   The pools of withdrawal liability established prior to December 31, 2005 have been either fully amortized as of December 31, 2018 or amount to zero.

\*\*   Does not reflect any adjustment that may be applicable due to the application of the 20-year cap in accordance with ERISA 4219(c)(1)(B).

Note: Detail figures may not add to totals shown due to rounding.

**VI.**   <u>**Application of De Minimis Rule**</u>

The amount of liability allocable is reduced by the smaller of:

(1)   3/4 of 1% of the Plan's unfunded present value of vested benefits (determined as of the end of the plan year ending before the date of withdrawal) or

(2)   $50,000,

reduced by the amount, if any, by which the unfunded vested benefits allocable to the employer exceeds $100,000.

Since the estimated total allocable share of unfunded vested benefits before reduction is $1,139,409, the de minimis amount is $0.

9

## VII.   Determining Payment and Length of Payment Period for Majestic Rug

It is our understanding that the employer did not withdraw in 2019. If the employer actually withdraws in 2020, the calculation of the allocable share of unfunded vested benefits must be redone once the January 1, 2020 valuation is finalized. However, an estimated payment schedule has been determined based on a withdrawal date in 2020. Once the allocable share of unfunded vested benefits is finalized, only the number of payments and final payment amount may change.

1.   Total wages* for years ended December 31:

| | | | |
|---|---|---|---|
| 2010 | $236,589 | 2015 | $199,381 |
| 2011 | 245,235 | 2016 | 228,353 |
| 2012 | 237,489 | 2017 | 231,957 |
| 2013 | 208,953 | 2018 | 234,027 |
| 2014 | 200,791 | 2019 | 236,992 |

2.   Highest consecutive three-year average units (total wages)............................ $239,771

3.   Contribution rate ........................................................................................ 7.00%

4.   Required annual payment (2) x (3)............................................................ $16,784.00

5.   Net allocable share of unfunded vested benefits .......................................... $1,139,409

6.   Plan Funding investment return assumption ................................................. 7.50%

7.   Amount of quarterly payments (4) ÷ four quarters ...................................... $4,196.00

8.   Number of full payments............................................................................. 80

Estimated Payment Schedule:
$4,196.00 per quarter for 80 quarters.

Please note the estimated payment schedule is subject to and reflects the twenty-year payment cap under ERISA Section 4219(c)(1)(B).

*Annual wages were estimated based on contribution information provided by the Fund Office.

9208100v2/02448.004

10

# EXHIBIT "C"

**March 2, 2021 Default on Pension Withdrawal Liability Letter**

# Local 810 Affiliated Pension Fund

24-09 38th Avenue • Long Island City, NY 11101
(212) 691-4100 Ext. 313

<u>**By Certified Mail/Return Receipt Requested**</u>

Majestic Rug Cleaning Company, Inc.
644 Whittier Street
Bronx, NY 10474

March 2, 2021

Re:    Default on Withdrawal Liability
       <u>**Local 810 Affiliated Pension Fund**</u>

Gentlemen:

By letter dated January 7, 2021 Local 810 Affiliated Pension Fund (the "Fund") notified Majestic Rug Cleaning Company (the "Company") of its obligation to pay withdrawal liability in accordance with Section 4219(c) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). At that time, the Company was provided with a demand for payment and payment schedule.

According to our records, the Company has not yet made payment as required. As a result, and in accordance with Section 4219(c)(5) of ERISA, the Company is now in default of its withdrawal liability. The Board of Trustees hereby requires immediate payment of the Company's withdrawal liability:

**ONE MILLION ONE HUNDRED THIRTY-NINE THOUSAND FOUR HUNDRED NINE DOLLARS ($1,139,409.00)**

To avoid legal action, please send a single payment of $1,139,409.00 made payable directly to the order of Local 810 Affiliated Pension Fund and forwarded to the undersigned at the address above.

If you have any questions, please contact the undersigned.

Sincerely,
Board of Trustees of the
Local 810 Affiliated Pension Fund

By: *Lorraine Buonacore*

Lorraine Buonacore
Fund Administrator

cc: Michael Smith, Local 810
    Mark Torres, Esq
    Matthew Scher